## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA
### (Civil Division)

| | |
|---|---|
| **DONNETTA WILSON,** individually and<br>As the Personal Representative of the Estate<br>Of **M.W.,**<br>5201 K Street, N.E., Apt # 333<br>Washington D.C. 20019 )<br><br>And<br><br>**NYJHAY LEWIS**<br>1414 Canal Street, S.W., Apt # 12<br>Washington D.C. 20024<br><br>And<br><br>**CURTIS GILMORE**<br>308 54th Street, N.E., Apt # 21<br>Washington D.C. 20019<br><br>        Plaintiffs,<br><br>    v.<br><br>**DISTRICT OF COLUMBIA HOUSING<br>AUTHORITY,**<br>1133 North Capital Street, N.E.,<br>Washington D.C. 20002<br><br>        Defendant. | **Case No.:**<br><br><br><br><br><br>**JURY TRIAL DEMAND** |

## COMPLAINT

COMES NOW, Plaintiffs, Donnetta Wilson, individually and as Personal Representative of the Estate of M.W., Nyjhay Lewis and Curtis Gilmore by and through their counsel, Brian K. McDaniel, Esq., and The McDaniel Law Group, P.L.L.C. and file this Complaint for damages against Defendant, District of Columbia Housing Authority on the grounds and in the amounts set forth herein:

**INTRODUCTION**

1.       The District of Columbia Housing Authority (DCHA) violates the basic health and safety mandates of the Fair Housing Act of 1937 as well as the mandate set out in the code section which created the DCHA entity. These regulations attempt to assure the health and safety of those low to moderate income families for whom the DCHA has been charged to provide basic and reasonable housing. DCHA currently and historically has maintained several of the Low to Moderate Income facilities in the District of Columbia in a fashion which violates the basic human rights, dignity and safety of men, women and children who are in need of public housing.  As such Defendants have violated the Due Process, Equal Protection, and Liberty Rights of tenants and their guests as well as their rights guaranteed under the Fair Housing Act of these tenants and guests to include the above listed plaintiffs.

2.       Since 1999 when DCHA was statutorily created and recognized, the agency has managed all of the Low to Moderate income public housing developments in the District. Many of these facilities are in "High Crime" areas with a disproportionately higher rate of gun violence, including Homicides, Robberies by Gun and Assaults with a Deadly Weapon (gun). DCHA has systematically and perpetually failed to secure or provide meaningful safety measures or procedures such that the tenants of these developments are made to live in near constant fear of death or serious bodily injury. This commitment to inaction evidences a pattern and practice of reckless and intentional disregard for the constitutionally and statutorily prescribed safety and health of the tenants for whom housing is provided in these developments. Plaintiffs bring this action against DCHA, the owner and manager of the Richardson Dwellings, a public housing development in the District of Columbia, for their pattern and practice of failing to provide decent and safe environments for its residents, guests and licensees and by historically failing to secure,

guard, manage and otherwise monitor this and many other facilities under their control by providing adequate security or gateage. DCHA is fully aware of the high rate of crime and the types of violent crimes committed in the developments for which it is responsible, yet defendants persist in their failure to provide adequate security measures to improve upon the health and safety of its residents.

3.      Specifically this action arises out of the shooting of Plaintiffs, Nyjhay Lewis and Curtis Gilmore and the shooting death of Plaintiff's Decedent, M.W. on July 16, 2018 at the Richardson Dwelling (a/k/a Clay Terrace) in Northeast Washington D.C. when a group of four (4) individuals entered into the housing development, discharging their firearms at innocent bystanders, including Plaintiffs and the Plaintiff's Decedent, M.W.

4.      At approximately 8:00 pm on July 16, 2018, Plaintiffs, Nyjhay Lewis, Curtis Gilmore and Plaintiff's Decedent, M.W. were shot while on the premises of the Richardson Dwellings (a.k.a. Clay Terrace) located at 321 53rd Street, N.E., Washington D.C. Plaintiff's Decedent, M.W. was shot in the back and was transported to Children's National Hospital where M.W. was pronounced dead. Mr. Gilmore was shot in the face and leg and transported to University of Maryland Medical Center in Baltimore where he was treated for his injuries. Nyjhay Lewis was shot in the left upper arm and was transported to Howard University Hospital where she was treated for her injuries. DCHA, with deliberate indifference, intentionally, and as a result of their demonstrable custom and practice, failed to provide any security or safety measures which would have been reasonably expected given the historic level of violent crimes which took place in the Richardson Dwelling facility and many of the other Low to Moderate Income facilities for which they were responsible. This failure resulted in the deprivation of rights of each of the Plaintiffs.

## PARTIES

5.      Plaintiff Donnetta Wilson is the surviving mother and Personal Representative of the Estate of M.W. who was ten-years of age at the time of her shooting death. Mrs. Wilson was at all times relevant hereto a citizen and resident of the District of Columbia, residing at 5201 K Street, N.E., Apt # 333, Washington D.C. 20019. At the time of the shooting, M.W. was living with Plaintiff, Donnetta Wilson in the Richardson Dwellings (a.k.a. Clay Terrace) located 321 53rd Street, N.E., Washington D.C. 20019. Mrs. Wilson was the leaseholder at the Richardson Dwellings residence.

6.      At all times relevant herein, Decedent, M.W., was a 10-year-old and minor resident of the District of Columbia residing at 321 53rd Street, N.E., Washington D.C. 20019.

7.      Plaintiff Nyjhay Lewis is an adult citizen and resident of Washington D.C. and was living with her mother, Plaintiff, Donnetta Wilson and sister M.W. in the Richardson Dwellings located at 321 53rd Street, N.E., Washington D.C. 20019.

8.      Plaintiff Curtis Gilmore is an adult citizen and resident of Washington D.C. and was visiting a friend at the Richardson Dwellings located at 321 53rd Street, N.E., Washington D.C. 20019.

9.      The District of Columbia Housing Authority ("DCHA") is an agency of the District of Columbia government created under the former District of Columbia Code Sec. 13-105 (District of Columbia Housing Authority Act of 1999) that owns and manages public housing units in the District of Columbia with its principal place of business at 1133 North Capitol Street, N.E., Washington D.C. 20002. At all times relevant to this lawsuit, DCHA has owned and managed the Richardson Dwellings Housing Development located at 321 53rd Street, N.E., Washington D.C. 20019. DCHA is run by its chairperson and ten other Board Commissioners.

4

10.     Defendant DCHA, either individually or by agents, representatives, servants or employees, owned, managed, supervised, secured, maintained and/or rented to tenants, exercised jurisdiction and control over the functioning of approximately 52 Low to Moderate income developments in the District of Columbia. It also exercised control over the Richardson Dwellings (a.k.a. Clay Terrace) and its common areas, and did employ agents, employees, officers, staff, administrators, representatives, and servants for Richardson Dwellings (a.k.a. Clay Terrace). Defendant DCHA exercised jurisdiction and control over the procedures and duties which said employees had the privilege and obligation to perform. Said employees worked in a common effort for the economic benefit of the Defendant.

## JURISDICTION AND VENUE

11.     This action arises under the Constitution of the United States, the Civil Rights Act, 42 U.S.C. § 1983 and The Fair Housing Act of 1968, 42 U.S.C. § 3604.

12.     This Court has jurisdiction over the Plaintiffs claims under 28 U.S.C. § 1331 (federal question) and under 28 U.S.C. § 1343 (civil rights deprivation).

13.     Venue is proper in the District of Columbia because this is where the Plaintiff resides, where the Defendant operates, and where the events complained of occurred.

## BACKGROUND

14.     In 1999 the DCHA was organized by statute, and charged with managing and providing Low to Moderate Income public housing for those who qualified for public housing assistance. Specifically, D.C. Code Section 6-202 (b) mandates that, "[t]he Authority shall govern public housing and implement the Housing Act of 1937 in the District, and shall be responsible for providing ***decent, safe, and sanitary dwellings, and related facilities***, for persons and families of low-and moderate-income in the District". Congress directed HUD, in the U.S. Housing Act as

amended, to promulgate "housing quality standards… that ensure that public housing dwelling units are safe and habitable." 42 U.S.C. § 1437d(f)(2). HUD in turn imposed a core regulatory requirement that all public housing "be decent, safe, sanitary, and in good repair" 24 C.F.R. § 5.703 (the "decent, safe, and sanitary" regulations). As defendant DCHA receives federal funds, they are required to submit "Public Housing Agency Plans" (hereinafter "PHA"). The PHA plan is a comprehensive guide to Authorities policies, programs, operations, and strategies for meeting local housing needs and goals. Section 5111 of the Quality Housing and Work Responsibility Act (QHWRA) of 1998 created the public housing agency Five-Year and Annual Plan requirement. Upon information and belief, DCHA has failed to adequately address the high level of violence attending many of its public housing developments in its PHA and/or has failed to meaningfully implement any of the strategies identified in its PHA designed to address the high level of crimes in these communities.

15.    Many of the developments which were subsequently managed by DCHA fell into obvious disrepair and blight, and were attended by ever increasing rates of violence and criminal activity. DCHA has systematically, historically and deliberately failed to provide safety measures and tools which would provide a safe dwelling for the plaintiffs and the other residents of public housing developments in High Crime Areas. The following list of facilities and the crimes committed therein are not exhaustive but represent an evidentiary sample of DCHA's deliberate decision not to provide reasonable safety tools and measures in these developments and for which DCHA is responsible. In these eleven developments alone, and in the five years prior to the incident at bar, there were one hundred and twelve (112) homicides, five hundred twenty-seven (527) Robberies by Gun and five hundred sixty-nine (569) Assaults by a Deadly Weapon (gun).

16.     In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Kenilworth Courts Development located at 4500 Quarles Street NW, Washington D.C. According to *Crime Maps,* (the website maintained by the Metropolitan Police Department which tracks the number of crimes and the types of crimes reported in a particular area and during specific periods of time), from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were nine (9) homicides, forty-eight (48) Robberies by Gun and forty-five (45) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities," DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility.  Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority.  (See Exhibit 1, *Crime Maps* Report for the Kenilworth Courts development, 07/16/2013 – 07/16/2018).

17.     In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Lincoln Heights Development located at 400 50th Street NE, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were twelve (12) homicides, seventy-one (71) Robberies by Gun and forty-three (43) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility.

Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority. (See Exhibit 2, *Crime Maps* Report for the Lincoln Heights development, 07/16/2013 – 07/16/2018)

18.     In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Benning Terrace Development located at 4450 G. Street SE, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were nine (9) homicides, thirty-seven (37) Robberies by Gun and fifty-one (51) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility. Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority. (See Exhibit 3, *Crime Maps* Report for the Benning Terrace development, 07/16/2013 – 07/16/2018)

19.     In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Syphax Gardens Development located at 1501 Half Street SW, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were six (6) homicides, sixteen (16) Robberies by Gun and forty-four (44) Assaults with a

Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility. Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority. (See Exhibit 4, *Crime Maps* Report for the Syphax Gardens, 07/16/2013 – 07/16/2018)

20.     In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the James Creek Apt. Development located at 1327 Half Street SW, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were six (6) homicides, twenty-two (22) Robberies by Gun and fifty-one (51) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility. Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority. (See Exhibit 5, *Crime Maps* Report for the James Creek Apts., 07/16/2013 – 07/16/2018)

21.     In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Fort Dupont Dwellings

Development located at 155 Ridge Road, SE, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were eleven (11) homicides, sixty-three (63) Robberies by Gun and sixty (60) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility. Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority. (See Exhibit 6, *Crime Maps* Report for the Fort Dupont Dwellings, 07/16/2013 – 07/16/2018)

22.     In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Stoddard Terrace development located at 357 Ridge Road SE, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were ten (10) homicides, sixty-six (66) Robberies by Gun and sixty-four (64) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility. Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by

any in-house law enforcement agency employed by the Authority. (See Exhibit 7, *Crime Maps* Report for the Stoddard Terrace Development., 07/16/2013 – 07/16/2018)

23.     In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Barry Farms development located at 1292 Eaton Road SE, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were fifteen (15) homicides, forty-five (45) Robberies by Gun and forty-three (43) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility. Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority. (See Exhibit 8, *Crime Maps* Report for the Barry Farms Development., 07/16/2013 – 07/16/2018)

24.     In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Potomac Gardens development located at 700 12th Street SE, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were four (4) homicides, fifty-six (56) Robberies by Gun and thirty-one (31) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility. Specifically,

defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority. (See Exhibit 9, *Crime Maps* Report for the Potomac Gardens Development., 07/16/2013 – 07/16/2018)

25.    In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Woodland Terrace development located at 2319 Ainger Place SE, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were twenty-one (21) homicides, forty-two (42) Robberies by Gun and eighty-four (84) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility. Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority. (See Exhibit 10, *Crime Maps* Report for Woodland Terrace Development., 07/16/2013 – 07/16/2018)

26.    In the five years prior to the shooting death of M.W. and the injuries sustained by the other Plaintiffs, DCHA was responsible for the management of the Henson Creek Town Home development located at 1804 Alabama Ave. SE, Washington D.C. According to *Crime Maps,* from July 16, 2013 to July 16, 2018, and within 1500 feet of its address, both on and off of its premises, there were fourteen (14) homicides, one hundred sixteen (116) Robberies by Gun and eighty-four

(84) Assaults with a Deadly Weapon by gun. In response to this level of violence and in contravention of its mandate to provide "decent, safe, and sanitary dwellings, and related facilities", DCHA ignored the level of violence taking place in this Low to Moderate Income public housing facility. Specifically, defendant DCHA failed to install any security cameras on the buildings in this development, failed to hire any private security service which would provide a more obvious and consistent law enforcement presence on the property and failed to ensure that the area was properly monitored by any in-house law enforcement agency employed by the Authority. (See Exhibit 11, *Crime Maps* Report for the Henson Creek Town Home Development., 07/16/2013 – 07/16/2018)

27.    By contrast, several other facilities owned, operated and managed by DCHA in more affluent sections of the city are in fact attended by the very types of security measures which are absent in the examples cited above. In the Kelly Miller Apartments, located at 2101 4th Street NW, the apartment building is attended by 24 hours security which requires identification to enter the building with a security presence on the premises as well as security cameras. At the Columbia Road Apartment Complex, located at 1475 Columbia Road NW, the apartment complex is attended by security cameras on the outside of the building. At the Harvard Towers Development, located at 1845 Harvard Street N.W., the perimeter and back door are attended by a 24 hours security presence. At the Garfield Terrace Seniors Development, located at 2301 11th Street NW, the facility is attended by 24 hour front desk security which requires identification to enter the building, security cameras on each floor of the building and weekend hall monitors. At the Judiciary House development, located ate 461 H Street NW, there is 24 hour security at the front desk with security cameras on each floor of the building. These are but a few examples of facilities for which DCHA has allocated time, energy and resources to provide security for these tenants

who live in comparatively low crime areas. Additionally, the demographic ratio of African-American tenants which reside in the housing developments for which security measures have been ignored are disproportionately, if not totally populated by African-American Tenants whereas the ratio for those facilities which have received resources for security measures are demonstrably populated by a mixture of Caucasian and African-American tenants.

### Richardson Dwelling (Clay Terrace) July 16, 2018 shooting.

28.    The Richardson Dwellings is advertised as a 'family property' located in Northeast Washington D.C. The community is comprised of a combination of townhouses and low-rise apartment buildings

29.    Clay Terrace is a part of the Richardson Dwellings and the Richardson Dwellings is commonly referred to as 'Clay Terrace'.

30.    The Richardson Dwellings, particularly the low-rise apartments located at 321 53rd Street, N.E., Washington D.C., is a property that is wide open with no security gates to prevent access by non-residents and trespassers. The area is not secured or patrolled by any security personnel to ensure the safety of the tenants, their guests or other licensees.

31.    The Richardson Dwellings, including Clay Terrace is located in a high crime area in Northeast Washington D.C. There have been various instances of significant and serious crime on and near the property, including multiple shootings and multiple instances of shots fired. There are dozens upon dozens of calls for service to Metropolitan Police every year regarding the Clay Terrace area located in the area of 321 53rd Street, N.E., Washington D.C.

32.    Plaintiff, Donnetta Wilson entered into a leasing agreement with the Richardson Dwellings. M.W. and Nyjhay Lewis were living with her at the time of the incident at issue.

33.     Residents of the Richardson Dwellings (a.k.a. Clay Terrace) complained to management about the violence in the area and the need for more security in the area to provide a safer environment.

34.     The Defendant's pattern and practice and deliberate indifference towards the safety of individuals who lived in this development resulted in DCHA's failure to provide gates around the premises located at 321 53rd Street, N.E., Washington D.C., to install visible security cameras or to secure appropriate private or DCHA Housing Authority security in response to the complaints made by the residents and the history of violence in the area. This resulted in a series of violent crimes in the premises which culminated in the shooting death of M.W. and the injuries to Nyjhay Lewis and Curtis Gilmore. There were no gates or any other encumbrances to the access employed by the assailants which led to the shooting of the Plaintiffs and Plaintiff's Decedent.

35.     The aforementioned security failures led to prior incidents of crime on the premises of the Richardson Dwellings (a.k.a. Clay Terrace), particularly prior assaults with deadly weapon (gun) and homicides. On December 9, 2003, two men were shot and killed in the 5300 block of Clay Terrace in the Richardson Dwellings. The homicide was the result of a disagreement regarding drug sales in the Clay Terrace neighborhood.

36.     On October 13, 2009, two teenagers were killed and three others were injured in the 5300 block of Clay Terrace during a drive-by shooting when the assailants entered a common area and discharged their firearms into a group of individuals gathered in the area. One of the deceased teenagers was a fifteen-year-old who was on his way home from school and an innocent bystander. The shooting occurred in broad daylight and was the result of a conflict between two rival gangs. These facts are no different than the occurrence at issue in this case.

37.    On May 12, 2014, a group of individuals was gathered in the 5300 block of Clay Terrace when a vehicle carrying multiple individuals discharged weapons at the group causing the group to run to safety to avoid being struck by the bullets.

38.    On Thursday October 29, 2015, at approximately 7:14 am law enforcement reported to the 5300 Block of Dix Street, N.E., where they found an adult male suffering from multiple gunshot wounds. This shooting is within 1,500 feet of the shooting at issue in this matter.

39.    On November 12, 2015, at or about 11:25 am, an individual was shot and killed in the 5300 block of Clay Terrace. Again, the shooting occurred in broad daylight.

40.    On January 3, 2016, a man was shot multiple times which sent him to the hospital with a gunshot wound from which he survived.

41.    During the eight (8) year period prior to the shooting on July 16, 2018, there were twenty-three (23) homicides, one hundred and eight (108) robberies with a gun, ninety-five (95) assaults with a dangerous weapon (gun) within 1500 feet of 321 53rd Street, N.E., Washington D.C.

42.    During the eight (8) year period prior to the shooting on July 16, 2018, there were a total of five hundred and sixty-five (565) violent crimes within 1500 feet of 321 53rd Street, N.E., Washington D.C.

43.    Despite the extensive history of criminal activity in and around Richardson Dwellings, DCHA failed to take proper measures to provide for appropriate and reasonable security devices and management on the premises.

44.    DCHA knew or had reason to know that inadequate security, including their failure to erect a gate, to install exterior security cameras, to hire a private security force or to ensure that Housing Authority police patrolled the area, or some other security effort, posed an unreasonable

risk of foreseeable harm to and violated the constitutional rights of the tenants and licensees and had knowledge, or in the exercise of reasonable diligence should have had knowledge, that it was certainly foreseeable that a tenant or guest would be injured on the premises as a result of the criminal act of a third party, specifically an incident involving the discharge of a firearm.

45.     As a result of DCHA's failures to address these very serious security and safety lapses and their deliberate indifference to the Due Process and Equal Protection rights of the plaintiffs, the premises were allowed to devolve into an area where criminals were not discouraged and could operate freely.

46.     DCHA intentionally, deliberately and purposefully refused to allocate the necessary funds and resources to address the security issues in the Richardson Dwelling. DCHA intentionally, deliberately and purposefully refused to allocate the necessary funds and resources to address the security issues in a disproportionate number of housing developments for which they were responsible in low income, high crime areas and quadrants of the District. As a result, crime continued to occur at the Richardson Dwellings.

47.     DCHA had a duty and was statutorily required to assure that tenants and guests were reasonably protected from harm and outsiders via operational security gates and adequately, properly trained security and management personnel which DCHA failed to provide or attempt to provide.

48.     DCHA's statutory mandate requires it to "be responsible for providing decent, safe and sanitary dwellings and related facilities, for persons and families of low and moderate income in the District." D.C. Code § 6-202(b). This language tracks the federal mandate outlined in the Federal Fair Housing Act of 1968.  DCHA failed to provide a safe environment for the tenants, guests and licensees of the Richardson Dwelling, where four (4) assailants were allowed to freely

enter onto the premises of the Richardson Dwelling and discharge their weapons at tenants and guests gathered outside of their homes.

49.     DCHA failed to provide adequate security for the tenants, guests and licensees of the premises. DCHA failed to properly staff, train, supervise and monitor its own Housing Authority Police force which was charged with providing physical security to the Richardson Dwelling and the other Low to Moderate income development in these High Crime area.

50.     DCHA failed to take additional measures after being put on notice that security measures were inadequate.

51.     DCHA intentionally and deliberately failed to reasonably and effectively implement security devices and adequate security policies necessary to protect tenants, guests and licensees. These failures and those outlined above, reveal the policy and custom of Defendant DCHA to purposefully ignore the security and safety needs of those low-income individuals who live in the Richardson dwelling and the other public housing facilities in high crime, low income areas of the District.

52.     DCHA intentionally and deliberately failed to secure the perimeter of the premises and/or parking lots of the Richardson Dwelling to prevent trespassing by those who were not tenants or licensees on the property.

53.     It was foreseeable to the Defendant DCHA that persons could enter onto the premises located at 321 53rd Street, N.E., Washington D.C. and shoot and kill an innocent bystander as evidenced by the prior incidents that occurred in 2003, 2009, 2014, 2015, and 2016.

54.     On the evening of July 16, 2018, M.W. was at her home located at 321 53rd Street, N.E., Washington D.C. with her sister, Plaintiff, Nyjhay Lewis. The area of 321 53rd Street, N.E., Washington D.C. was filled with residents and guests as it was the dead of summer. There are no

barriers separating the street from the premises. There is no private or governmental security force presence on the property. There are not external security cameras which are visible to potential wrongdoers that are present anywhere on the property.

55.     M.W. was leaving her mother's residence with her sister, Nyjhay Lewis to purchase a snack from the ice cream truck.

56.     At the same time, Plaintiff, Curtis Gilmore was a guest and outside in the common area of 321 53rd Street, N.E., Washington D.C. playing dominoes with friends from the area.

57.     At the same time, four (4) assailants who were not tenants of the Richardson Dwellings drove onto the parking lot of the premises completely unimpeded, parked in the parking lot adjacent to the low-rise apartments, exited their vehicle, and began to discharge their weapons at least sixty (60) times into the crowd of residents and guests in the common area, including the Plaintiffs, Nyjhay Lewis and Curtis Gilmore, and Plaintiff's Decedent, M.W.

58.     Before M.W. and her sister, Plaintiff, Nyjhay Lewis could step from the front stoop of Plaintiff Donnetta Wilson's residence, M.W. was shot in the back with one (1) round from the bullets discharged by the four (4) assailants. M.W. fell to the ground after being shot. Plaintiff Donnetta Wilson was standing on the porch area as M.W. was shot.

59.     The bullet that struck M.W. entered her back and traveled through the muscle of the back, the posterior right eleventh rib, the lower lobe of the right lung, the right atrium of the heart, the pericardial sac, the right lobe of the thymus, the right third intercostal space, the fourth costochondral junction and the muscles, soft tissues and the skin of the mid-chest where it exited her body.

60.     Plaintiff, Donnetta Wilson fell to the ground and held M.W. in her arms screaming, "[p]lease don't let my baby die!" As Plaintiff Donnetta Wilson screamed in anguish, M.W. told her mother to 'calm down, it's burning!'

61.     M.W. was transported by ambulance to Children's National Hospital where she was pronounced dead.

62.     Plaintiff, Nyjhay Lewis was also struck by one of the bullets in her upper right arm and sustained a lip contusion. Plaintiff, Nyjhay Lewis was next to her sister, M.W. and witnessed as she was shot by the discharge of bullets by the four (4) assailants. Plaintiff Nyjhay Lewis was transported to Howard University Hospital where she was treated for her injuries.

63.     Plaintiff, Curtis Gilmore was struck by two (2) of the bullets discharged by the four (4) assailants in the face and the leg. He was transported to University of Maryland Medical Center in Baltimore Maryland where he was treated for his injuries.

64.     While present at the premises located at 321 53rd Street, N.E., Washington D.C., M.W., Nyjhay Lewis and Curtis Gilmore, as a result of the deliberate indifference, custom policies and practices of Defendant more fully described below, were assaulted, shot, seriously and mortally injured while legally on the premises and had their constitutional rights violated.

65.     Mark Price, Quentin Michals, Qujuan Thomas, Gregory Taylor and Marquell Cobbs have all been arrested in connection with the July 16, 2018 shooting that severely injured Plaintiffs, Nyjhay Lewis and Curtis Gilmore and fatally wounded Plaintiff's Decedent, M.W.

66.     On February 12, 2019, Plaintiff Donnetta Wilson was appointed as Personal Representative of the Estate of M.W. in the matter of In Re: M.W. with Case No.: 2019 ADM 000129.

## COUNT I – VIOLATION OF 42 U.S.C.§ 1983
### (Donnetta Wilson, individually and as PR of the Estate of M.W. v. DCHA)

**Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth, Fifth, Fourteenth, and First Amendments and in violation of 42 U.S.C. § 1983**

67.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

68.     42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

69.     Plaintiff in this action is a citizen of the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

70.     The Defendants to this claim at all times relevant hereto were acting under the color of state law.

71.     Plaintiff had the following clearly established rights at the time of the complained of conduct:

a.   the fundamental substantive due process right to be secure in their person.

b.   the fundamental substantive due process right to bodily integrity, bodily safety and liberty, free from unjustifiable government interference under the, Fourth, Fifth and Fourteenth Amendments;

c.   the right to equal protection under the law pursuant to the Fourteenth Amendments.

d.   violation of their statutory right to the provision of "***decent, safe, and sanitary dwellings, and related facilities***, for persons and families of low-and moderate-income

21

in the District"

72.    Defendant DCHA knew or should have known of these rights at the time of the complained of conduct and failures as they were clearly established at that time.

73.    The acts or omissions of Defendants, DCHA, as described herein, deprived the Plaintiff of her constitutional and statutory rights and caused them other damages.

74.    The acts or omissions of Defendant DCHA, their Board of Directors and their staff as described herein, intentionally, systematically and deliberately deprived Plaintiff of her constitutional and statutory rights and caused them other damages.

75.    Defendant DCHA, its Board of Directors and its staff are not entitled to qualified immunity for the complained of conduct.

76.    Defendant DCHA, its Board of Directors and its staff were, at all times relevant, policymakers for the authority, and in that capacity established policies, procedures, customs, and/or practices for the DCHA.

77.    Defendant DCHA developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens living in low to moderate public housing, which were moving forces behind and proximately caused the violations of the Plaintiff's constitutional and federal rights as set forth herein and in the other claims, and resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives. Specifically, Defendant deliberately and intentionally failed to install exterior security cameras, employ and hire private security firms, erect gateage or other barriers to preclude trespassers from entering the property or to, supervise, maintain, train or properly staff

the DCHA Police force for the provision of sufficient security to the plaintiffs and other public housing tenants.

78.    Defendant DCHA has created and tolerated an atmosphere of lawlessness, and has developed and maintained long- standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public.

79.    As a direct result of DCHA's unlawful conduct, Plaintiffs has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory, punitive and special damages. As a further result of these Defendant's unlawful conduct, Plaintiff has incurred special damages, including medical expenses and may continue to incur further medical expenses or other special damages related expenses. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

80.    As a direct result of the wrongful acts committed by the Defendant, Plaintiff Donnetta Wilson and the Estate of M.W. incurred burial expenses, medical expenses, and suffered the loss of future economic potential of M.W. and other recoverable damages.

81.    Defendant DCHA permitted the premises located at 321 53rd Street, N.E., Washington D.C. to be kept in an unsafe manner by failing to erect gates or other security devices around the premises to prevent non-tenants, unwanted guests and the criminal element from having unfettered access to the premises including the assailants that shot Plaintiffs, Nyjhay Lewis and Curtis Gilmore and killed M.W.

82.    Defendant DCHA knew or should have known that the premises with no gate or other security device around it created an unsafe environment given the prevalence of gun activity in the area, particularly, shootings, Robberies, Assaults and homicides.

83.    As a proximate result of Defendant DCHA's pattern, policy, custom and practice of failing to provide a safe environment for the tenants and guests of the premises located at 321 53rd Street, N.E., Washington D.C., Plaintiff's Decedent, M.W. was fatally shot in the back by a bullet discharged from the gun of one of the four (4) assailants that entered onto the premises unimpeded on July 16, 2018.

## COUNT II – VIOLATION OF 42 U.S.C.§ 1983
### (Nyjhay Lewis v. DCHA)
**Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth, Fifth, Fourteenth, and First Amendments and in violation of 42 U.S.C. § 1983**

84.    Plaintiff Nyjhay Lewis hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

85.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

86.    Plaintiff in this action is a citizen of the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983. At all times relevant to the allegations outlined herein, Plaintiff Lewis resided with her mother, Donnetta Wilson, in their apartment within the Richardson Dwelling Development.

87.    The Defendant to this claim at all times relevant hereto was acting under the color

of state law.

88.    Plaintiff had the following clearly established rights at the time of the complained of conduct:

e.   the fundamental substantive due process right to be secure in her person.

f.   the fundamental substantive due process right to bodily integrity, bodily safety and liberty, free from unjustifiable government interference under the, Fourth, Fifth and Fourteenth Amendments;

g.   the right to equal protection under the law pursuant to the Fourteenth Amendments.

h.   violation of their statutory right to the provision of "***decent, safe, and sanitary dwellings, and related facilities***, for persons and families of low-and moderate-income in the District"

89.    Defendant DCHA knew or should have known of these rights at the time of the complained of conduct and failures as they were clearly established at that time.

90.    The acts or omissions of Defendant, DCHA, as described herein, deprived the Plaintiff of her constitutional and statutory rights and caused them other damages.

91.    The acts or omissions of Defendant DCHA, its Board of Directors and its staff as described herein intentionally, systematically and deliberately deprived Plaintiff of her constitutional and statutory rights and caused her other damages.

92.    Defendant DCHA, its Board of Directors and its staff are not entitled to qualified immunity for the complained of conduct.

93.    Defendant DCHA, its Board of Directors and its staff were, at all times relevant,

policymakers for the authority, and in that capacity established policies, procedures, customs, and/or practices for the DCHA.

94.     Defendant DCHA developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens living in low to moderate public housing, which were moving forces behind and proximately caused the violations of the Plaintiff's constitutional and federal rights as set forth herein and in the other claims, and resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives. Specifically, Defendant deliberately and intentionally failed to install exterior security cameras, employ and hire private security firms, erect gateage or other barriers to preclude trespassers from entering the property or to, supervise, maintain, train or properly staff the DCHA Police force for the provision of sufficient security to the Plaintiffs and other public housing tenants.

95.     Defendant DCHA has created and tolerated an atmosphere of lawlessness, and has developed and maintained long- standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public.

96.     As a direct result of DCHA's unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling her to compensatory, punitive and special damages. As a further result of these Defendant's unlawful conduct, Plaintiff has incurred special damages, including medical expenses and may continue to incur further medical expenses or other special damages related expenses. Plaintiff is further

entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

97.     As a direct result of the wrongful acts committed by the Defendant, Plaintiff Nyjhay Lewis incurred medical expenses and other damages.

98.     Defendant DCHA permitted the premises located at 321 53rd Street, N.E., Washington D.C. to be kept in an unsafe manner by failing to erect gates or other security devices around the premises to prevent non-tenants, unwanted guests and the criminal element from having unfettered access to the premises including the assailants that shot Plaintiff, Nyjhay Lewis and Curtis Gilmore and killed M.W.

99.     Defendant DCHA knew or should have known that the premises with no gate or other security device around it created an unsafe environment given the prevalence of gun activity in the area, particularly, shootings, Robberies, Assaults and homicides.

100.     As a proximate result of Defendant DCHA's policy, custom and deliberate failure to provide a safe environment for the tenants and guests of the premises located at 321 53rd Street, N.E., Washington D.C., Plaintiff Nyjhay Lewis was shot in the left upper arm by a bullet discharged from the gun of one of the four (4) assailants that entered onto the premises unimpeded on July 16, 2018.

### COUNT III – VIOLATION OF 42 U.S.C.§ 1983
**(Curtis Gilmore v. DCHA)**
**Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth, Fifth, Fourteenth, and First Amendments and in violation of 42 U.S.C. § 1983**

101.     Plaintiff, Curtis Gilmore, hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

102.     42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

103.    Plaintiff in this action is a citizen of the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983. At all times relevant hereto, Plaintiff Gilmore was an invitee on the property of the Richardson Dwelling Public Housing Development. He was lawfully on the property and was not a trespasser as he had been invited by the Plaintiff Nyjhay Lewis and others on July 16, 2018.

104.    The Defendant to this claim, at all times relevant hereto, were acting under the color of state law.

105.    Plaintiff had the following clearly established rights at the time of the complained of conduct:

   a.  the fundamental substantive due process right to be secure in his person.

   b.  the fundamental substantive due process right to bodily integrity, bodily safety and liberty, free from unjustifiable government interference under the, Fourth, Fifth and Fourteenth Amendments;

106.    Defendant DCHA knew or should have known of these rights at the time of the complained of conduct and failures as they were clearly established at that time. Defendant DCHA knew or should have known that residence of the Richardson Dwelling development might also have lawfully present guests who were subject to an unreasonable risk of death or serious bodily injury as a result of their unlawful failures.

107.   The acts or omissions of Defendant, DCHA, as described herein, deprived the Plaintiff of his constitutional and statutory rights and caused him other damages.

108.   The acts or omissions of Defendant DCHA, its Board of Directors and its staff as described herein intentionally, systematically and deliberately deprived Plaintiff of his constitutional and statutory rights and caused him other damages.

109.   Defendant DCHA, its Board of Directors and its staff are not entitled to qualified immunity for the complained of conduct.

110.   Defendant DCHA its Board of Directors and its staff were, at all times relevant, policymakers for the authority, and in that capacity established policies, procedures, customs, and/or practices for the DCHA.

111.   Defendant DCHA developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens living in low to moderate public housing and their guests, which were moving forces behind and proximately caused the violations of the Plaintiff's constitutional and federal rights as set forth herein and in the other claims, and resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives. Specifically, Defendant deliberately and intentionally failed to install exterior security cameras, employ and hire private security firms, erect gateage or other barriers to preclude trespassers from entering the property or to, supervise, maintain, train or properly staff the DCHA Police  force for the provision of sufficient security to the Plaintiff and other public housing tenants resulting in harm to Plaintiff Gilmore.

112.   Defendant DCHA has created and tolerated an atmosphere of lawlessness, and has

developed and maintained long- standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public.

113.   As a direct result of DCHA's unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory, punitive and special damages. As a further result of the Defendant's unlawful conduct, Plaintiff has incurred special damages, including medical expenses and may continue to incur further medical expenses or other special damages related expenses. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

114.   As a direct result of the wrongful acts committed by the Defendant, Plaintiff Curtis Gilmore incurred medical expenses and other damages.

115.   Defendant DCHA permitted the premises located at 321 53rd Street, N.E., Washington D.C. to be kept in an unsafe manner by failing to erect gates or other security devices around the premises to prevent non-tenants, unwanted guests and the criminal element from having unfettered access to the premises including the assailants that shot Plaintiffs, Nyjhay Lewis and Curtis Gilmore and killed M.W.

116.   Defendant DCHA knew or should have known that the premises with no gate or other security device present, absent any other security deterrent, created an unsafe environment given the prevalence of gun activity in the area, particularly, shootings, Robberies, Assaults and homicides.

117.     As a proximate result of Defendant DCHA's  policy, custom and deliberate failure to provide a safe environment for the tenants and guests of the premises located at 321 53rd Street, N.E., Washington D.C., Plaintiff Curtis Gilmore was shot in the face  and leg by bullets discharged from the guns of one of the four (4) assailants that entered onto the premises unimpeded on July 16, 2018.

**COUNT IV**
**Violation of Rights Secured By the Equal Protection Clause of the**
**Fourteenth Amendment 42 U.S.C. § 1983**
**Donnetta Wilson in her personal capacity and as P.R. for the Estate of M.W. and**
**Nijhay Lewis v. DCHA**

118.     Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if realleged fully herein.

119.     Plaintiffs Donnetta Wilson, decedent M.W. and Nyjhay Lewis are members of a suspect class and were subject to the disparate treatment of DCHA, in their custom, practices, and policy of providing greater security measures and allocating greater resources (both financial and human) in public housing developmens in the District of Columbia which are demographically attended by a larger Caucasian population by ratio of African-American to Caucasian tenants.

120.     Upon information and belief, the demographic ratio of African-American to Caucasian tenants in those housing developments for which security measures have been ignored are demonstrably populated by a nearly exclusive African-American community, whereas the ratio for those facilities which have received resources for security measures are demonstrably populated by a mixture of Caucasian and African-American tenants.

121.     Defendant DCHA knew or should have known of these rights at the time of the complained of conduct and failures as they were clearly established at that time.

122.     The acts or omissions of Defendant DCHA, as described herein, deprived the

Plaintiffs of their constitutional and statutory rights and caused them other damages.

123.     The acts or omissions of Defendant DCHA, its Board of Directors and its staff as described herein intentionally, systematically and deliberately deprived Plaintiffs of their constitutional and statutory rights and caused them other damages.

124.     Defendant DCHA, its Board of Directors and its staff were, at all times relevant, policymakers for the authority, and in that capacity established policies, procedures, customs, and/or practices for the DCHA. These acts were done by the Defendant while acting under color or state of law and had the effect of depriving the Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Donnetta Wilson, individually and as personal representative of the estate of M.W. respectfully request that this Court grant the following relief:

110.     The Court award Plaintiff damages in the amount of not less than thirty million dollars ($30,000,000.00) against Defendant DCHA;

111.     The Court award pre-judgment interest on all sums due to the Plaintiff identified in this action;

112.     The Court award attorney's fees and costs of this action incurred by Plaintiff identified in this action;

113.     The Court award monetary relief to each of the heirs entitled to the same pursuant to the Wrongful Death Act. D.C. Code § 16-2701.

114.    The Court award such other and further relief as may be proper and to which Plaintiff is entitled.

115.    That the Court award punitive damages for the constitutional violations as against Defendant DCHA

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Curtis Gilmore, respectfully requests that this Court grant the following relief:

116.    The Court award Plaintiff damages in the amount of not less than five million ($5,000,000.00) against the Defendant;

117.    The Court award pre-judgment interest on all sums due to the Plaintiff identified in this action;

118.    The Court award attorney's fees and costs of this action incurred by Plaintiff identified in this action;

119.    The Court award such other and further relief as may be proper and to which Plaintiff is entitled.

120.    That the Court award punitive damages for the constitutional violations as against Defendant DCHA

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Nyjhay Lewis, respectfully requests that this Court grant this following relief:

121.    The Court award Plaintiff damages in the amount of not less than five million dollars ($5,000,000.00) against the Defendant;

122.    The Court award pre-judgment interest on all sums due to the Plaintiff identified in this action;

123.    The Court award attorney's fees and costs of this action incurred by Plaintiff identified in this action;

124.    The Court award such other and further relief as may be proper and to which Plaintiff is entitled.

125.    That the Court award punitive damages for the constitutional violations as against Defendant DCHA.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury on all counts so triable.

Respectfully submitted,

THE MCDANIEL LAW GROUP, P.L.L.C.

/s/ Brian K. McDaniel
Brian K. McDaniel, Esq. [452807]
1001 L Street, S.E.,
Washington D.C. 20003
Tel: 202-331-0793
Fax: 202-331-7004
Email: brianmac1911@aol.com